UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| MARK MOORE, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 4:20-cv-04124-SLD-JEH |
| ILLINOIS BELL TELEPHONE CO., LLC d/b/a AT&T, | ) ) ) ) |
| Defendant. | ) ) |

ORDER

Before the Court is Defendant Illinois Bell Telephone Co., LLC d/b/a AT&T's ("Illinois Bell" or "Bell") motion for summary judgment, ECF No. 29. For the reasons that follow, the motion is GRANTED.

**BACKGROUND[1]**

Plaintiff Mark Moore began working at Illinois Bell's Rock Island location in 2007. In 2015, he became a Retention Specialist. In that role, Moore fielded calls from customers and attempted to retain their business while selling them additional services.

The record contains some background facts pertaining to Moore's history and performance at Bell generally. Between 2013 and 2018, he received about a dozen attendance-related warnings. On two occasions in 2016, he was placed on thirty-day performance improvement plans due to poor performance. In 2018, he served a one-day suspension due to

---

[1] The facts in this section are drawn from Bell's statement of undisputed material facts, Mem. Supp. Summ. J. 2–8, ECF No. 30; Plaintiff Mark Moore's response to Bell's statement and additional facts, Mem. Supp. Resp. 2–6, ECF No. 36; Bell's reply thereto, Reply 2–5, ECF No. 38; and exhibits to the filings, which are identified with descriptive titles and the ECF page number(s).

1

attendance. That year, each of Moore's monthly "scorecards" showed he satisfied various performance metrics. *See* Reply 3, ECF No. 38 (quoting Mem. Supp. Resp. 4, ECF No. 36).

Denise Westerfield became Moore's supervisor in 2017. As a Sales Coach, Westerfield listened to recorded calls and coached consultants as to how to improve their customer interactions. Westerfield reported to Area Sales Manager Brad Simmons.

In October 2018, Moore received diagnoses of anxiety, depression, and insomnia; he also alleges a disability of post-traumatic stress disorder ("PTSD"). From that month onward, Moore took multiple leaves of absence "in one-day or smaller increments" pursuant to the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601–54. *See* Reply 4 (quoting Mem. Supp. Resp. 5).

### I. The June 24, 2019 Call

On June 24, 2019, a customer asked to speak with Moore's supervisor; Moore left the customer on silent hold for over eight minutes before transferring him to a team leader.[2] According to Westerfield, the customer then complained that Moore had acted "very unprofessionally towards him." Westerfield Aff. ¶ 9, ECF No. 31 at 2–4. Westerfield listened to a recording of the call, which "revealed that Moore laughed at the customer, acted in a condescending manner, raised his voice at the customer, and left the customer on a silent hold for more than eight minutes." *Id.*[3]

---

[2] Moore disputes this fact because "it was common for similarly situated employees to place customers who requested to speak with a supervisor on hold for extended periods because it was difficult to get the managers to take these calls. Employees were rarely if ever, disciplined in this situation." Mem. Supp. Resp. 2. But it is not clear how those facts undermine Bell's alleged fact. Pursuant to Civil Local Rule 7.1(D)(2)(b)(5), additional facts intended to contextualize or reframe the movant's facts should be introduced separately. *Cf. Bone Care Int'l, LLC v. Pentech Pharms., Inc.*, 741 F. Supp. 2d 865, 868 n.1 (N.D. Ill. 2010) (explaining that, under the Northern District of Illinois's analogous rules, "it is improper for a party to smuggle new facts into its response to a party's . . . statement of fact").

[3] Moore maintains that he "never admitted to laughing at the customer" and notes that the "specific behavior" of laughing at customers is not explicitly addressed in Bell's Code of Business Conduct. Mem. Supp. Resp. 2. Again, it is not clear how these facts contradict or undermine Bell's alleged facts; moreover, whether Moore laughed at the

At annual trainings held pursuant to Bell's Code of Business Conduct ("COBC"), employees learn that customers cannot be left on silent hold in excess of 90 seconds. The COBC also disallows behavior that could harm Bell's reputation; requires professional and courteous communication with customers; and prohibits employees from sharing proprietary or sensitive information. On June 27, 2019, Westerfield "placed [Moore] on a Final Written Warning step of discipline" for violating the COBC. COBC Letter, ECF No. 31 at 29. The letter from Westerfield informing Moore about the discipline expressed Bell's expectation that Moore "take action to immediately" correct his behavior; indicated that further COBC violations could lead to discipline "up to and including termination"; and encouraged Moore to review the COBC in full and "seek clarification from [his] manager as needed." *Id.* In addition to the letter, Moore "was pulled into an office" and told "that [he] had put somebody on hold too long" and that it was "inappropriate" he had raised his voice. Moore Dep. II 81:9–24, ECF No. 30-3 at 30–72.

## II.   Moore's FMLA Leave

On July 2, 2019, Moore requested FMLA leave for a period of 30 days. Bell approved Moore's leave through August 4, 2019. Moore returned to work on or about August 5, 2019.

## III.   The August 2019 Calls

Westerfield listened to recordings of Moore's calls on August 10, 2019 and August 12, 2019. During calls on August 10, 2019, Moore revealed his salary; discussed his medical history; described Bell's termination policy; and shared opinions on school shootings and gun policy. He also offered stock advice; told a customer that the "the devil got in [his ex-wife's] head" when she turned 40 and detailed her infidelity with multiple partners; and made religious

---

customer is not dispositive. Moore also observes that Bell "did not furnish a recording of this call as part of its discovery responses." *Id.* To the extent Moore is suggesting the call did not occur, that is foreclosed by his testimony. *See* Moore Dep. II 82:1–23, ECF No. 30-3 at 30–72; *see also id.* at 135:11–12 ("I had put the customer on hold and . . . raised my voice . . . .").

3

references, telling one customer that the "Holy Spirit [wa]s with [him]." Westerfield Aff. ¶ 13 (quotation marks omitted). During calls on August 12, 2019, Moore again discussed infidelity; left a customer on silent hold for over four minutes; referenced a recent mass shooting in Texas; told a customer he keeps a gun in his car at work and disagrees with Bell's policy disallowing concealed carry; and discussed his use of online dating services, telling one customer that "women just want to hook up." *Id.* ¶ 14 (quotation marks omitted).

On August 12, 2019, Westerfield, Sales Coach Robin Pena, union representative Sue Elder, and Moore met to discuss Moore's calls. *Id.* ¶ 16. Westerfield instructed Moore to follow a Call Flow Script.[4] She also notified Simmons that Moore had been discussing inappropriate topics with customers.

On August 13, 2019, Westerfield listened to another call between Moore and a customer. During that call, Moore made religious references to the customer and again stated that the "Holy spirit [wa]s with [him]." *Id.* ¶ 15 (quotation marks omitted).

### IV.  Moore's First Suspension

Shortly after the meeting on August 12, 2019, Westerfield was told by members of her team that Moore had made threats against her. Westerfield began receiving anonymous text messages, including a message depicting a drive-by shooting. She reported the message to Simmons and the Rock Island Police Department. Simmons suspected that Moore was

---

[4] Attached to Westerfield's affidavit is what Westerfield describes as a "sample script." Westerfield Aff. ¶ 16; Sample Script, ECF No. 31 at 34. Retention Specialist Julian Gaona avers that the script "is a script from . . . back in 2015." Gaona Aff. ¶ 14, ECF No. 36-5. The contents of the script Moore received are irrelevant to the disposition of this motion. Relatedly, Moore challenges Westerfield's claim that "[s]cripts are given to all members of [her] team at the Rock Island call center," Westerfield Aff. ¶ 16. Mem. Supp. Resp. 2. As support, he cites Retention Specialist Eileen Martinez's averment that call scripts were not required for retention specialists in 2019. *Id.* (citing Martinez Aff. ¶ 10, ECF No. 36-1). But Westerfield did not aver that all members of her team were required to follow scripts. And whether Westerfield gave scripts to all her team members is immaterial to the outcome of this motion.

responsible and suspended him on August 14, 2019.[5] Upon finding no evidence Moore had made the threats, Simmons rescinded the suspension. Moore was asked to return to work on September 4, 2019.

### V. Moore's Second Suspension

When Moore returned to work, he was taken to a meeting with Simmons, Elder, and Attendance Team Manager Daphne Ganahl. Moore's calls with customers were discussed. Simmons then told Moore that he had received anonymous allegations that Moore had been making sexual comments to two employees.[6] Simmons suspended Moore pending further investigation "[b]ecause of Moore's inappropriate and unprofessional communication with customers and the allegations that he made sexual comments to two employees." Simmons Aff. ¶ 15, ECF No. 33-1 at 2–3. Simmons also recommended to Illinois Bell's Employee Relations Manager that Moore be "suspended pending termination for engaging in unprofessional behavior in violation of the [COBC]." *Id.* ¶ 16. Simmons notified Moore the next day "that his suspension pending investigation was changed to a suspension pending termination." *Id.* ¶ 17. Moore filed a grievance with the union.

### VI. Moore's Termination

On September 13, 2019, the Union-Management Review Board Meeting convened. At the meeting were Moore; Simmons; Ganahl; a business representative named Mike Scime; Bell's

---

[5] Moore asserts that he was suspended before Westerfield audited his August 2019 calls. Mem. Supp. Resp. 3. As support, he cites to Gaona's affidavit, in which Gaona avers that "the allegation that Mr. Moore threatened Ms. Westerfield occurred before Ms. Westerfild audited Mr. Moore's calls." Gaona Aff. ¶ 13. Setting aside that Gaona's affidavit does not suggest his assertion is grounded in personal knowledge, *cf. Watson v. Lithonia Lighting*, 304 F.3d 749, 751–52 (7th Cir. 2002) (concluding that the plaintiff's affidavit, in which she averred two other employees had received disability accommodations, "was not based on personal knowledge and did not imply the availability of any admissible evidence" because, among other flaws, it "d[id] not explain how she learned this"), Gaona does not testify as to the date of Moore's suspension.

[6] Moore disputes this fact, *see* Mem. Supp. Resp. 3, but it is deemed admitted; Moore failed to "[s]upport the claim that the fact is disputed with evidentiary documentation referenced by specific page," Civil LR 7.1(D)(2)(b)(3).

Lead Labor Relations Manager, Amy Skinner; and Moore's union vice president, Bill Henne. Per Skinner, the meeting's purpose was "to review the facts that [we]re available concerning the contemplated dismissal and to permit [Moore] to present any facts or information which [he] or [the] Union believe[d] should be brought to the Company's attention when considering the matter." Dismissal Panel Meeting 1, ECF No. 30-3 at 105–13 (capitalization altered). Moore does not dispute that, at the meeting, he admitted that he should not have had conversations with customers related to infidelity, dating sites, religion, his medical history, women in their 40s having midlife crises, gun policies, and his divorce. He also admitted that those conversations violated the COBC.[7]

In a letter dated September 17, 2019, Skinner notified Henne of Bell's decision to terminate Moore "for violating the COBC" following "a review of the facts" presented at the meeting. Sept. 17, 2019 Letter, ECF No. 30-3 at 114. Ganahl notified Moore of his termination by phone.

## VII.   Coworker Comments?

---

[7] Moore's deposition provides additional detail as to the meeting from his perspective. At the meeting, Skinner asked Moore if he had made comments such as
- [M]y wife turned 40 and [women's] minds, hormones don't match up. That's how it happened with my wife. . . . That's what I call the devil got in her head somehow. . . . My daughter said, when you are at work, mom has guys come over. I put a camera in my home and between five to six days there were three different guys. I put a camera in our bedroom. When I confronted her and told her I put a camera in, she said, yeah, we need to talk.
- [H]ow far are you aware [sic] from that El Paso? When you are in the wrong place at the wrong time. I work in what you call a centralized office, so they are talking about having active shooter drills and all of that. I have a concealed carry, but my union says I can't bring a that weapon to work. I can leave it in my vehicle. I feel the company has an outdated policy.

Moore Dep. II 97:7–102:6. Moore indicated that many of the topics he had discussed were inappropriate, including infidelity, *id.* at 99:3–8; PTSD, *id.* at 101:18–21; weapons and violence, *id.* at 102:19–103:5; and stocks, divorce, and religion, *id.* at 112:16–24. In his deposition, however, Moore explained that Henne told him "that the best way to handle this was to show remorse," *id.* at 113:5–11, so Moore answered Skinner's questions accordingly, *see, e.g.,* 103:6–13. Moore now maintains that many of his conversations were not inappropriate, though some conversations were. *See, e.g., id.* at 111:14–16 (agreeing that he "had no problem with [talking about] cannabis, but . . . thought that talking about stocks was improper"). Nevertheless, what is important here that Moore admitted he violated the COBC and continues to acknowledge he violated the COBC in at least some respects.

Many, if not most, of the above facts were introduced by Bell. Moore's additional facts largely pertain not to the timeline of his termination but rather Bell's workplace more generally. Four exhibits support these facts: an affidavit from Retention Specialist Eileen Martinez; an affidavit from Retention Specialist Julian Gaona; and two screenshots from the Facebook Messenger application, one undated, between an unnamed user and a user named "Britney."[8]

In its reply, Bell argues that most of this evidence is inadmissable and asks the Court to strike it. Reply 5–8. Evidentiary objections such as these can pose a "quandary" to district courts because the proponent of the evidence often has no natural opportunity to respond. *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595 (7th Cir. 2017). Such is the case here; the local summary judgment rules do not explicitly contemplate sur-replies, *see* Civil LR 7.1(D).

The Court is mindful that it "may consider only admissible evidence in assessing a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). And some of Moore's evidence is plainly inadmissible. For example, Gaona cannot aver that Westerfield knew the topics Moore discussed with customers, Gaona Aff. ¶ 8, ECF No. 36-5, because an affiant cannot speculate as to the knowledge of another person, *Jenkins v. Heintz*, 124 F.3d 824, 831 (7th Cir. 1997). Nor can Martinez aver that management "definitely held [taking FMLA leave] against" employees because a "top performer" who "took a lot of FLMA [sic]" was never awarded an annual incentive trip, Martinez Aff. ¶ 6, ECF No. 36-1. *See O'Regan v. Arb. Fs., Inc.*, 246 F.3d 975, 986 (7th Cir. 2001) ("[S]tatements by a non-decision-maker that amount to mere speculation as to the thoughts of the decision-maker are irrelevant to an inquiry of discrimination." (quotation marks omitted)); *see also Visser v. Packer Eng'g Assocs., Inc.*,

---

[8] Moore represents that this is Retention Specialist Britney Johnson. *See* Mem. Supp. Resp. 5 (referring to the second screenshot as "Facebook Message from Britney Johnson").

7

924 F.2d 655, 659 (7th Cir. 1991) (en banc) (distinguishing admissible "primary facts," from which inferences as to motivation can be drawn, from inadmissable "psychoanalysis").

But some evidence may be admissible because it is non-hearsay or falls under a hearsay exception. Other evidence Bell asks the Court to strike was never cited to by Moore. And, perhaps most crucially, the evidence Moore introduces is insufficient to defeat summary judgment. Thus, in the interest of judicial economy and mindful of this case's summary judgment posture, the Court will assume that the additional material facts introduced by Moore, so long as they are supported and based on personal knowledge,[9] are admissible. This evidence, Mem. Supp. Resp. 4–6, consists of the following facts:

- Martinez reported to Westerfield in 2019. Martinez Aff. ¶ 2. Six months prior to Moore's termination, Martinez asked Westerfield about a call during which Moore discussed his divorce with a customer. *Id.* ¶ 3. Westerfield "laughed and told [her] that is how Mr. Moore builds rapport with his customers and that rapport is why his customers trust him." *Id.* Westerfield told Martinez she "had to make [her] calls more personal" and "should be more like Mr. Moore when building rapport with [her] customers." *Id.*
- Moore was "either number 1 or 2 in the office" on February 22, 2019. Mem. Supp. Resp. 4.
- Per Gaona, when Moore was on FMLA leave, Westerfield "would make comments like 'Mark's leaving again.' [He] also heard her say 'well unfortunately I have a bunch of people who take FMLA on my team.'" Gaona Aff. ¶ 9. Martinez also heard Westerfield "make statements that when employees took FMLA leave, it would hurt her numbers and negatively impact

---

[9] For instance, Additional Material Fact 3, Mem. Supp. Resp. 4, is not supported by its citation, and Additional Material Fact 7 has no citation at all, *id.* at 5. Furthermore, although Martinez avers that employees who did not take FMLA and violated Bell's silent hold policy were "routinely not written up," Martinez Aff. ¶ 7, the Court finds that there is insufficient information in Martinez's affidavit to conclude this statement is grounded in personal knowledge, and in any event, it lacks evidentiary value. *See Packer v. Trs. of Ind. Univ. Sch. of Med.*, 800 F.3d 843, 850 (7th Cir. 2015) (affirming the district court's disregard of "summary assertion[s] of differential treatment" that "g[a]ve[] the reader no reason to believe that [the affiant] has the requisite personal knowledge"); *Abioye v. Sundstrand Corp.*, 164 F.3d 364, 368 (7th Cir. 1998) (affirming the district court's disregard of affiants' "conclusory statements," which failed to "demonstrate[], with sufficient particularity, that they actually knew" of unequal treatment); *see also Morrow v. Wal-Mart Stores, Inc.*, 152 F.3d 559, 563 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." (quotation marks omitted)). Other statements in Martinez's affidavit suffer similar infirmities. Her affidavit does not explain how she came to know the FMLA status of any of her coworkers, state the basis for her belief that coworker Doug Clearman failed to meet performance goals, or explain how she is privy to management's audit practices. Martinez Aff. ¶¶ 4–5, 7, 9.

her bonus." Martinez Aff. ¶ 8. "Britney" also states that "[D]enise would say in huddle the other people needed to make up for the other people who weren't there." Britney Message, ECF No. 36-4.

- Gaona, and perhaps others, would discuss religion, politics, personal matters, current events, investments, and the legalization of marijuana with customers. Gaona Aff. ¶¶ 4–5.[10]

With these additional facts relayed, the Court briefly recounts the procedural history of this case before turning to Bell's motion.

## VIII. Procedural History

Moore filed this action in state court on May 4, 2020. *See* Not. Removal 1, ECF No. 1 at 1–4. Bell removed it to federal court, *see id.* at 2, and Moore filed an amended complaint on June 5, 2020, *see* First Am. Compl. 1, ECF No. 6. Moore filed a second amended complaint on October 29, 2020. *See* Second Am. Compl. 1, ECF No. 20. In Count I, Moore alleges disability discrimination. *Id.* at 1–2. In Count II, he alleges FMLA retaliation. *Id.* at 3–4. Bell now seeks summary judgment as to both counts. *See* Mot. Summ. J. 1.

## DISCUSSION

### I. Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate if the party opposing summary judgment fails to establish a genuine issue of fact on an element essential to its case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Where one party has properly moved for summary judgment, the non-moving party must respond "by

---

[10] It is quite plausible that Gaona could have personal knowledge regarding other calls—coworkers may overhear one another or discuss their work during breaks—though his affidavit does not make clear the basis of his personal knowledge. However, because the inclusion of this fact is not dispositive and it could readily be within Gaona's personal knowledge, the Court assumes *arguendo* that it can be considered.

identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). The court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial"—that is, whether "there is sufficient evidence favoring the non[-]moving party for a jury to return a verdict" in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). The court must view the evidence "in the light most favorable to the non-moving party[] and draw[] all reasonable inferences in that party's favor." *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (quoting *Roger v. Yellow Freight Sys., Inc.*, 21 F.3d 146, 149 (7th Cir. 1994)).

## II. Analysis

### a. Count I – Disability Discrimination[11]

"[T]he well-known and oft-used *McDonnell Douglas* framework for evaluating discrimination remains an efficient way to organize, present, and assess evidence in discrimination cases." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).[12] Under this framework, the plaintiff "carries 'the initial burden . . . of establishing a

---

[11] Moore's second amended complaint invokes the protections of both the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–213, and the Illinois Human Rights Act ("IHRA"), 775 ILCS 5/1-101.1–10-104. *See* Sec. Am. Compl. 2. "When analyzing claims of discrimination under the [IHRA], Illinois courts have looked to the standards applicable to analogous federal claims." *Suvada v. Gordon Flesch Co.*, No. 11 C 07892, 2013 WL 5166213, at *11 (N.D. Ill. Sept. 13, 2013) (alteration in original) (quotation marks omitted). It is not clear if Moore is still pursuing an IHRA claim. *See* Mem. Supp. Resp. 1 (asserting that the second amended complaint brings ADA and FMLA claims but not referencing the IHRA). Nevertheless, as the claims rise and fall together, the Court need not engage in separate analysis.

[12] The Court cites to cases involving other antidiscrimination laws, such as Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17, because the statutes are similar. *See Miranda v. Wis. Power & Light Co.*, 91 F.3d

prima facie case of . . . discrimination.'" *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012) (second alteration in original) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If successful, the burden shifts to his employer to articulate a legitimate, nondiscriminatory reason for its action, then returns to the plaintiff to submit evidence that the proffered reason is pretextual. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013).

"*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination." *David v. Bd. of Trs. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017). Under the approach articulated in *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016), the court simply evaluates "whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021). The Court considers Moore's evidence under both approaches.

### i. *McDonell Douglas*

To establish a prima facie case, "a plaintiff must show: (1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer." *Id.* at 957. Bell argues that Moore cannot show that he was meeting its legitimate expectations or that comparators received better treatment. Mem. Supp. Mot. J. 9–12.

Because Moore repeatedly violated the COBC, he cannot show that he was meeting Bell's legitimate expectations. *See, e.g.*, *Kelly v. Project of the Quad Cities, Inc.*, Case No. 4:19-

---

1011, 1017 (7th Cir. 1996) ("[I]n analyzing claims under the ADA, it is appropriate to borrow from our approach to the respective analog under Title VII.").

cv-04078-SLD-JEH, 2021 WL 1566444, at *5 (C.D. Ill. Apr. 21, 2021) ("[B]ecause it is not disputed that [the plaintiff] violated company policy, she cannot show that she was performing adequately."); *E.E.O.C. v. Aurora Health Care Inc.*, 933 F. Supp. 2d 1079, 1104 (E.D. Wis. 2013) ("An employee who violates her employer's established policies fails to perform adequately or meet her employer's legitimate expectations."). Moore maintains that his annual "scorecards" demonstrate he was satisfying expectations. Mem. Supp. Resp. 8. But even if he was a top salesman, *see id.* at 4, that does not vindicate his failure to meet other expectations, *see Martino v. MCI Commc'ns Servs., Inc.*, No. 07 C 2627, 2008 WL 2157170, at *9 (N.D. Ill. May 21, 2008) ("[A]lthough [the plaintiff] presents evidence that his qualified sales numbers were high, meeting [his employer's] expectations as to one aspect of his job does not establish that he was meeting [the employer's] performance expectations as to every aspect of his job."), *aff'd*, 574 F.3d 447 (7th Cir. 2009); *Ulmer v. Bob Watson Chevrolet, Inc.*, No. 97 C 7460, 1999 WL 1101332, at *3 (N.D. Ill. Nov. 29, 1999) ("Evidence that [the] plaintiff was a good salesman does not rebut [the] defendant's argument that [the] plaintiff failed to meet its legitimate expectations, however, because the reason [the] defendant gave for firing [the] plaintiff was not poor performance, but insubordination."). For example, Moore violated Bell's silent hold policy on June 24, 2019, and after receiving a Final Written Warning indicating that further violations could lead to termination, again violated the policy on August 12, 2019.[13] *See* Mem. Supp. Resp. 2 (admitting Bell's Fact 25); Mem. Summ. Mot. Summ. J. 5 (asserting as Fact 25 that Moore "left a customer on a silent hold for over four minutes" on that date). He also frequently

---

[13] This is the case even if the silent hold policy was unreasonable, as employers "can set unrealistic standards and fire an employee for not being able to meet them" so long as that is not a mask for discrimination. *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1571 (7th Cir. 1989) ("[The employer] can . . . try to force a square peg into a round hole—and throw away the peg when it doesn't fit.").

discussed personal topics, social/political issues, and Bell's internal policies with customers, sometimes even making crude comments. Thus, Moore cannot show he was meeting Bell's legitimate expectations at the time of his termination.

Likewise, Moore cannot establish that similarly situated employees received more favorable treatment. He points only to Martinez, who "held the same position and had the same supervisor." Mem. Supp. Resp. 9. Although Moore asserts, without evidentiary support, that she was not disabled and that Bell "did not catch" her discussing inappropriate topics, *id.*, he provides no evidence that Martinez actually engaged in such communications, let alone in a similar manner, *see generally* Martinez Aff. In any event, that Bell "did not catch" Martinez engaging in those conversations makes her an unsuitable comparator. *See Gaines v. K-Five Constr. Corp.*, 742 F.3d 256, 263 (7th Cir. 2014) ("Without . . . evidence [that any supervisor was aware of the comparator's conduct], [the plaintiff] cannot defeat summary judgment."). Thus, Moore cannot avoid summary judgment under the *McDonell Douglas* approach.

    **ii.** *Ortiz*

"[T]he question remains: has the non-moving party produced sufficient evidence to support a jury verdict of intentional discrimination?" *David*, 846 F.3d at 224. Moore's argument is better suited to this straightforward inquiry. His theory of discrimination is basically this: Westerfield baselessly accused Moore of threatening her, setting in motion his suspension, then audited his calls, setting in motion his termination. Mem. Supp. Resp. 9–10. Plus, Moore insinuates his conduct was not actually forbidden by the COBC; in fact, Bell encouraged its employees to engage in similar conversations with customers. *See id.* (emphasizing that Westerfield told Martinez to be more like Moore on her calls).

13

One major problem with this theory is that no evidence supports Moore's timeline. The record shows that Westerfield audited Moore's calls on August 10, 2019 and August 12, 2019. Westerfield met with Moore on August 12, 2019 to discuss the calls she audited. Then, on August 14, 2019, she approached Simmons about the threatening text message. The undisputed facts make clear Westerfield could not have audited the calls after August 14, 2019 because she and Moore discussed the calls two days prior.

Timeline error aside, other issues remain. Neither party makes clear who decided to terminate Moore, but it was clearly not Westerfield; recall that Simmons made the initial recommendation to Bell's Employee Relations Manager, who then agreed. Nevertheless, Moore points the finger at Westerfield and her conduct as the impetus for his termination. *See id.* at 9–10, 12. This is a cat's paw theory of discrimination. "This theory applies when a biased supervisor 'who lacks decisionmaking power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Vesey v. Envoy Air, Inc.*, 999 F.3d 456, 461 (7th Cir. 2021) (quoting *Johnson v. Koppers, Inc.*, 726 F.3d 910, 914 (7th Cir. 2013)).

Even if Westerfield did possess animus against Moore on the basis of his disability,[14] "[t]he mere fact that an employee's wrongdoing was reported by a biased supervisor with a retaliatory or discriminatory motive does not establish liability under a cat's paw theory." *Id.* at 462. Where the employer's decision to act does "not rely on the credibility of a biased supervisor—that is, the employer believed it had independently sufficient reasons, such as corroboration of the allegations, to take the adverse action—then the employee's cat's paw

---

[14] The Court need not consider whether Moore could show Westerfield actually possessed such animus. *See Sinha v. Bradley Univ.*, 995 F.3d 568, 574 (7th Cir. 2021) ("Because the cat's paw theory requires a showing of both discriminatory animus *and* proximate causation, we need not address both prongs if the employee makes an insufficient showing on one.").

theory will fail for lack of proximate cause." *Id.* Here, Simmons independently reviewed Moore's calls, determined that they violated the COBC, and recommended to Bell's Employee Relations Manager that Moore be terminated. The Employee Relations Manager agreed. Moore then had the opportunity to present his case at the Union-Review Board Meeting. Several days later, a final decision was rendered. These layers of independent review, none of which involve Westerfield, foreclose Moore's cat's paw theory. *See id.* (no cat's paw where "even if [the employee's] general manager had a retaliatory motive, there is no evidence that [the employer's] investigators relied on the veracity of the complaint for anything but initiating the investigation"); *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 370 (7th Cir. 2019) (no cat's paw where biased supervisor did not belong to evaluation committee and evaluation committee did not review false materials); *Woods v. City of Berwyn*, 803 F.3d 865, 870 (7th Cir. 2015) (no cat's paw where "formal and adversarial procedures" broke the chain of causation").[15]

Of course, an important part of Moore's argument is his suggestion that his freewheeling conversations were sanctioned by Bell and not prohibited by the COBC. *See* Mem. Supp. Resp. 10. But he lacks evidence that would allow a reasonable fact-finder to credit that scenario. The closest he gets is Martinez's claim that Westerfield told her to make her calls more personal after she asked Westerfield about a call during which she heard Moore mention his divorce. Martinez Aff. ¶ 3. But there is no evidence that Westerfield was aware of or was endorsing Moore's entire roster of personal and political conversation topics; Martinez does not even make clear what she told Westerfield Moore said. Similarly, although Gaona avers he and others discussed a similar breadth of topics at work, Gaona Aff. ¶¶ 4–5, there is no indication anyone at Bell knew. And there is no indication Gaona and his coworkers did so with the same frequency, revealed internal

---

[15] Because there is no evidence the threat against Westerfield or the allegations of sexual harassment against Moore played any part in Moore's termination, the Court need not consider their veracity.

information about Bell, made comments that could be perceived as sexual or denigrating, or violated the silent hold policy. Only a train of impermissible speculation could lead to the conclusion that Bell was in the practice of tolerating shock-jock sales strategies from its employees.

Simply put, no reasonable jury could conclude disability discrimination motivated Moore's termination. The evidence makes clear he was terminated due to various instances of unprofessional behavior in violation of the COBC, including inappropriate conversations with customers and repeated violations of Bell's hold policies. Accordingly, summary judgment on Count I is appropriate.

  b. **Count II – FMLA Retaliation**

"Retaliation claims under the FMLA . . . require three familiar elements: (1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018); *see also Guzman v. Brown Cnty.*, 884 F.3d 633, 640 (7th Cir. 2018) ("In order to prevail on a FMLA retaliation claim, a plaintiff must present evidence that she was subject to an adverse employment action that occurred because she requested or took FMLA leave."). Moore contends that Illinois Bell took adverse actions against him by terminating his employment and failing to award him an annual incentive trip called the Summit Trip. Mem. Supp. Resp. 10–14. Bell disputes that the latter constitutes an adverse action. Mem. Supp. Mot. Summ. J. 14. Bell also argues that Moore has "[n]o evidence . . . to support the claim that [he] was terminated because he took a leave of absence." *Id.* at 13–14.

Regardless of whether Bell's failure to award Moore the Summit Trip can be considered an adverse action,[16] Moore cannot show retaliation was its cause. Simply put, Moore introduces no evidence as to who selected the Summit Trip attendee, let alone that this individual (or group of individuals) knew that he had taken FMLA leave. *See Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 351 (7th Cir. 2009) ("Because [the decisionmaker] did not know that [the plaintiff] took FMLA leave, he could not have possibly terminated her for that reason."); *Smith v. Kindezi Acad., LLC*, Case No. 1:19-cv-04648-TWP-DML, 2021 WL 4477869, at *10 (S.D. Ind. Sept. 30, 2021) ("[T]he Court can quickly resolve the FMLA retaliation claim: Because [the decisionmaker] did not know about [the plaintiff] asking about parental leave before deciding to terminate him, she could not have retaliated against him for any FMLA request." (quotation marks omitted)); *see also Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("A decision maker cannot have been motivated to retaliate by something unknown to him."). For this same reason, it is difficult to consider Bell's failure to award Moore the Summit Trip "part of the convincing mosaic of circumstantial evidence required to demonstrate a causal connection between Mr. Moore exercising his rights under FMLA and his termination," Mem. Supp. Resp. 13.[17]

---

[16] Moore argues that the Summit Trip constitutes a "benefit" of his employment. Mem. Supp. Resp. 12 (citing 29 U.S.C. § 2614(a)(1)(B)). This argument seems to conflate the lay meaning of benefit with its meaning as an employment term of art. *See* 29 U.S.C. § 2611(5) ("The term employment benefits means all benefits provided or made available to employees by an employer, including group life insurance, health insurance, disability insurance, sick leave, annual leave, educational benefits, and pensions . . . ." (quotation marks omitted)). The test for whether an action is materially adverse under the FMLA is "whether a reasonable person in the plaintiff's circumstances would be dissuaded from engaging in protected activity." *Freelain*, 888 F.3d at 902. There may be circumstances in which an employer's failure to award an employee a merit-based incentive trip constitutes an adverse action. *Cf. Reagan-Diaz v. Sessions*, 246 F. Supp. 3d 325, 343 n.7 (D.D.C. 2017), (assuming, without deciding, that the employee's exclusion from a list of nominees for a prestigious award from her employer constituted a materially adverse action where the employee claimed she had been included in the list initially and then removed), *aff'd sub nom. Reagan-Diaz v. Whitaker*, 748 F. App'x 353 (D.C. Cir. 2019). But here, there is too little information about the trip to draw a conclusion in either direction.

[17] Although a "plaintiff can rely on a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker," *Juday v. FCA US LLC*, 57 F.4th 591, 596 (7th Cir. 2023), it is not a legal test, *see Ortiz*, 834 F.3d at 764–65.

Without the Summit Trip, Moore's case for retaliation is the same as his case for disability discrimination.  *See* Mem. Supp. Resp. 11 ("restat[ing] all of the circumstantial evidence presented in the ADA section").  It fails for the same reasons: Moore cannot sustain a cat's paw theory on these facts, and his other evidence is lacking.  Accordingly, summary judgment on Count II is appropriate.

## CONCLUSION

Accordingly, Defendant Illinois Bell Telephone Co., LLC d/b/a AT&T's motion for summary judgment, ECF No. 29, is GRANTED.  The Clerk is directed to enter judgment and close the case.

Entered this 17th day of May, 2023.

s/ Sara Darrow<br>
SARA DARROW<br>
CHIEF UNITED STATES DISTRICT JUDGE